IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| SHANE CAHILL and NYE PETERSON, individually and on behalf of all others similarly situated, | § § § | CASE NO. 1:20-cv-441 |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | CLASS ACTION COMPLAINT |
| | § | |
| TURNKEY VACATION RENTALS, INC., | § § | |
| | § | |
| *Defendant*, | § | **DEMAND FOR JURY TRIAL** |

**PLAINTIFFS' CLASS ACTION COMPLAINT**

Plaintiffs Shane Cahill and Nye Peterson ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against TurnKey Vacation Rentals, Inc. ("Defendant" or "TurnKey"), by and through their attorneys, and allege as follows based on information and belief, except as to allegations specifically pertaining to Plaintiff, which are made upon personal knowledge:

**INTRODUCTION**

1.      COVID-19, a global pandemic that needs little introduction, has wreaked unprecedented havoc across the globe. Indeed, although the virus was not detected in the United States until mid-January 2020, it has now infected at least 800,000 people across the country.

2.      In an effort to slow the virus's spread and protect the capacity of local health systems, beginning in late February state and local governments across the country began issuing "stay-at-home" orders that confine residents to their homes, allowing them to leave only for necessities such as medical care and food. As a result, the American economy is in tatters, and

millions of Americans find themselves jobless and wondering where they will turn for income if the crisis persists.

3.     Unsurprisingly, travel has come to a near standstill as Americans find themselves unable to leave their homes, let alone travel domestically or internationally. Airlines have cancelled millions of flights in light of reduced demand and shelter-in-place orders nationwide, and hotels and rental companies have cancelled reservations that consumers are, for all intents and purposes, prohibited from using.

4.     Although airlines and hospitality providers, as well as their employees, have been impacted by COVID-19, the vast majority recognize that their customers are far more vulnerable in the current economic climate and are proceeding accordingly. For example, Airbnb, a vacation rental company, is refunding all guests for reservations made before March 14, 2020—before the full scope and magnitude of the pandemic was revealed—*and* created a $250 million fund to compensate property owners impacted by COVID-19 related cancellations.[1]

5.     Unfortunately for Plaintiffs and the putative Class, however, TurnKey—an Austin-based vacation rental company that manages more than 5,000 properties in 21 states—has sought to shift the burden of this extraordinary crisis onto its customers, who, in some cases, paid thousands of dollars for rentals the COVID-19 pandemic has or will preclude them from using.

6.     Specifically, TurnKey has ignored its contractual obligation to refund Plaintiffs and similarly situated consumers (1) whose rental properties became unavailable, (2) whose reservations TurnKey cancelled, or (3) who cancelled reservations made more than ten (10) days prior to check-in within seventy-two (72) hours of booking, due to the avalanche of civic orders prohibiting travel to and from most parts of the United States.

---

[1] https://www.airbnb.com/resources/hosting-homes/a/250m-to-support-hosts-impacted-by-cancellations-165 (last visited Apr. 22, 2020).

7.     TurnKey instead has elected to offer "credits" that Plaintiffs and the Class neither need nor want, particularly in lieu of sorely needed financial resources, and thereby breached the rental agreements into which it entered with Plaintiffs and all other persons who reserved rental properties through TurnKey prior to March 14, 2019.

8.     TurnKey has breached its agreements with its customers and unjustly enriched itself at their expense. Accordingly, Plaintiffs bring this action in order to secure refunds for each and every similarly situated consumer TurnKey wronged by refusing to issue full refunds for cancellations necessitated by the COVID-19 crisis as TurnKey's various agreements require.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(d)(2), the Class Action Fairness Act of 2005, because: (i) there are 100 or more Class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendant is headquartered in this district, transacts business in this district, is subject to personal jurisdiction in this district, and therefore is deemed to be a citizen of this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

### A. *Plaintiff Shane Cahill*

11.     Plaintiff Shane Cahill is a resident of Montana, and currently resides in Gallatin County.

3

12.     On or about January 24, 2020, Plaintiff Cahill reserved a rental property located in Mount Pleasant, South Carolina from April 7, 2020 to April 13, 2020  through the website VRBO.com

13.     Once the property was booked, however, Plaintiff Cahill began receiving emails from TurnKey about his reservation.

14.     Plaintiff Cahill booked the TurnKey rental property located in South Carolina to attend his sister's wedding, which had been scheduled to occur on Saturday April 11, 2020 in Mount Pleasant, South Carolina.

15.     On January 24, 2020, Plaintiff Cahill received an email from sender@messages.homeaway.com that provided, "You may be contacted by TurnKey Vacation Rentals regarding your reservation by email."

16.     The January 24, 2020 email further indicated that Plaintiff Cahill would be charged a total of $1,950.56 for his reservation, including $205.00 for "professional housekeeping" and a "service fee" of $154.00. The January 24, 2020 email further indicated that Plaintiff Cahill was required to pay the first installment of his rental fee by January 24, 2020 in the amount of $333.66, and the remainder by March 8, 2020 in the amount of $1,616.90.

17.     On January 25, 2020, Plaintiff Cahill received a "TurnKey Vacation Rentals Guest Agreement" (Ex. A).

18.     On January 25, 2020, Plaintiff Cahill received an email from TurnKey indicating that his reservation amount was $1,796.56, and that "amounts will not include any service fees from booking websites (other than TurnKey)."

19.     On January 25, 2020, Plaintiff Cahill paid the required deposit of $333.66 on the South Carolina rental property.

4

20.     On March 7, 2020, Plaintiff Cahill received an email from TurnKey indicating that his payment had been processed successfully for his rental dates of April 7 to April 13, 2020.

21.     On March 18, 2020, Plaintiff Cahill learned that his sister's wedding might be rescheduled so he emailed TurnKey to inquire about changing the dates for his reservation. He did not receive a response.

22.     On March 21, 2020, Plaintiff Cahill received an email from TurnKey indicating that it had "made [its] cancellation policy more flexible," offering him the opportunity to cancel to receive a full credit for a future stay, for the amount of the non-refundable amount you paid."

23.     On March 31, 2020, Plaintiff Cahill received an email from TurnKey reminding him that he was "just 7 days away from [his] trip to Mount Pleasant, SC" and providing him with check-in and check-out information.

24.     On March 31, 2020, Plaintiff Cahill received an email from TurnKey stating "Mount Pleasant Shutdown just issued major restrictions on travel and hospitality to help limit the impacts of COVID-19. . . . This unfortunately impacts your upcoming stay with us at 625 Williamson Drive. For your convenience and to avoid longer than normal wait times trying to contact us, we will **automatically cancel your booking and issue you a credit in the amount of $1,796.56 toward a future stay**." (emphasis in original).

25.     On March 31, 2020, Plaintiff Cahill sent an email to TurnKey following up on his previous email of March 18, 2020 to which he had not received a response, inquiring about changing the dates of his reservation and indicating that he wanted a refund if TurnKey could not offer him a property on his new dates.

26.     In response to his March 31, 2020 email, Plaintiff Cahill received an email from Turnkey on March 31, 2020 stating it had "temporarily changed the cancellation policy, but still, we cannot offer to refund your reservation payment. The original booking must be canceled on or before the original arrival date or June 1, 2020, whichever comes first. The new booking must be booked on or before February 1, 2021, at the same home, and must have an arrival date on or before October 1, 2021. Please note that there will be no refunds if canceled, and this offer is non-transferable. The total credit is limited to the amount of the original booking, and no refunds will be given for the difference in reservation value. But, if the new reservation is more expensive, you will be responsible for the difference."

27.     On April 1, 2020, Plaintiff Cahill received an email from sender@messages.homeaway.com stating "*Unfortunately, the property manager had to cancel your reservation* in The Groves, Mount Pleasant, SC, USA for Apr 7, 2020 – Apr 13, 2020." (emphasis added). The email further provided that "The property manager is responsible for the refund of your property rental fee."

28.     On April 11, 2020, TurnKey emailed Plaintiff Cahill, stating it had "updated [its] cancellation policy to follow many travel industry leaders by issuing credits toward a future stay. . . As your request has escalated to TurnKey's corporate office, we can restate that our new policy has added flexibility to provide credits toward a future stay up to 18 months in the future, however, we are not issuing refunds."

29.     Plaintiff Cahill's sister's wedding has been rescheduled to Saturday, October 17, 2020. Plaintiff contacted TurnKey to rebook the same property from October 13, 2020 to October 19, 2020, but was informed that the property is booked during those dates.

30.     Plaintiff Cahill requested that TurnKey reserve a comparable rental property for him in the same area as the one he had initially booked. TurnKey, however, informed Plaintiff Cahill that no other rental properties were available.

31.     TurnKey has also failed to credit Plaintiff Cahill with the housekeeping fee of $205.00.

**B.  Plaintiff Nye Peterson**

32.     Plaintiff Nye Peterson is a resident of Texas, and currently resides in Round Rock located in Travis County.

33.     On or about February 16, 2020, Plaintiff Peterson reserved a rental property located at Zona Rosa Ski Resort in Santa Fe, New Mexico from March 15 – March 20, 2020 through TurnKey.

34.     On March 15, 2020, Plaintiff Peterson began driving from her home in Texas to the New Mexico rental property.

35.     While travelling from Texas to New Mexico, Plaintiff Peterson learned that Zona Rosa Ski Resort had shut down due to COVID-19, that New Mexico was considering closing its border with Texas, and that Texas was considering issuing a shelter-in-place order covering all residents.

36.     As a result of anticipated difficulties returning home to Texas from New Mexico, Plaintiff Peterson and her family determined that they had to return home and cancel their trip to New Mexico.

37.     When driving back home, Plaintiff Peterson attempted to reach TurnKey by telephone to notify them of her need to cancel the reservation.

38.     Despite several attempts, Plaintiff Peterson was unable to reach TurnKey by phone so she also sent them a text message notifying them of the need to cancel the reservation. She did not receive a response to her text message.

39.     On April 5, 2020, Plaintiff Peterson received an email from TurnKey stating that, "As your request has escalated to TurnKey's corporate office, we can restate that our new policy has added flexibility to provide credits toward a future stay up to 18 months in the future, however we are not issuing refunds."

40.     However, Plaintiff Peterson is unable to travel the same dates in 2021, has no use for the rental unit that she had reserved for March 2020 or for any other TurnKey rental properties.

41.     Plaintiff Peterson has advised TurnKey that she is unable to travel the same dates in 2021, has no use for the rental unit that she had reserved for March 2020 or for any other TurnKey rental properties, but has still not received a refund from TurnKey.

42.     On April 5, 2020, Plaintiff Peterson received an email from TurnKey requesting that she review her stay at the TurnKey property.

**C. Defendant TurnKey Vacation Rentals, Inc.**

43.     Defendant TurnKey Vacation Rentals, Inc. ("TurnKey") is a Delaware corporation with its principal place of business located in Austin, Texas. It may be served with process upon its registered agent for service of process, Capitol Corporate Services, Inc. at 206 E. 9th Street, Suite 1300, Austin, Texas 78701, or wherever she may be found.

44.     TurnKey was founded in 2012 as an alternative to rental companies such as Airbnb and VRBO.

45.     TurnKey has grown exponentially, and now manages more than 5,000 homes in 80 cities across 21 states: Alabama, Arizona, California, Colorado, Florida, Georgia, Hawaii, Illinois,

Maine, Massachusetts, Nevada, New Jersey, New Mexico, North Carolina, Oregon, South Carolina, Tennessee, Texas, Utah, Washington, and Wyoming.[2]

46.     TurnKey earns revenue by, *inter alia*, charging property owners a commission of 18-23% per booking.[3] Due to its success since its founding, TurnKey has attracted approximately $100 million in venture capital funding.[4]

## FACTUAL ALLEGATIONS

### A.  The COVID-19 Pandemic

47.     COVID-19 initially appeared contained to China and other portions of eastern Asia. But on January 20, 2020, authorities diagnosed the first official case of COVID-19 in the United States, in a 35-year-old who had recently returned from Wuhan to the State of Washington.

48.     COVID-19 spread quickly. By January 30, 2020, there were nearly 8,000 confirmed cases of COVID-19 worldwide. In response, the WHO declared COVID-19 a "Public Health Emergency of International Concern." The next day, President Trump declared a public health emergency due to COVID-19, and the U.S. State Department banned travel between the United States and China.

49.     Unfortunately for residents of the United States, COVID-19 was spreading silently, steadily increasing its reach. On February 29, 2020—the same day the U.S. government issued a "do not travel" warning and prohibited travel between the United States and several countries with COVID-19 outbreaks—the  State of Washington became the first state to declare a state of emergency due to COVID-19. It would not be the last to do so.

50.     On March 11, 2020, the WHO reclassified COVID-19 as a worldwide pandemic.

---

[2] https://www.turnkeyvr.com/aboutus (last visited Apr. 22, 2020).
[3] https://blog.turnkeyvr.com/choosingbetweenturnkeyandvacasa/ (last visited Apr. 22, 2020).
[4] https://www.turnkeyvr.com/aboutus (last visited Apr. 22, 2020).

51.     The President declared a "National Emergency" on March 13, 2020 and, on March 15, the Centers for Disease Control and Prevention recommended avoiding gatherings of 50 people or more. The next day, the federal government tightened those guidelines and recommended avoiding groups of 10 people or more.

52.     Despite these efforts, by March 23, 2020 the United States had reported more confirmed cases of COVID-19 than any other county in the world, and by the end of March the governors of most states had declared states of emergency due to COVID-19. State and local officials across the country also had issued stay-at-home orders that canceled public events, banned group gatherings, and closed schools, restaurants, and retail stores and prohibited unnecessary travel for weeks, if not indefinitely.

53.     As a direct and proximate result of this unprecedented crisis, many airlines canceled or rescheduled flights, and event such as weddings, reunions, meetings and conventions also were postponed or cancelled altogether.

54.     State and local governments placed significant restrictions on hospitality providers. For example, Mount Pleasant, South Carolina issued a shelter-in-place order in March that, as TurnKey acknowledged in an email to Plaintiff Cahill, required it to cancel all reservations in the area while the shutdown was in place.

55.     Unlike most of its competitors, however, in the face of this crisis and concern from travelers TurnKey changed its refund policies to the detriment of its customers.

**B.  TurnKey's Rental Agreement**

56.     TurnKey's "Guest Agreement,"[5] which Plaintiffs and all Class members agreed to when reserving a TurnKey managed property, requires TurnKey to refund its customers for cancellations required by the current crisis.

57.     Paragraph 12 of the Guest Agreement provides that "[i]n the rare event the Home that that you have reserved is for sale, is sold **or is otherwise unavailable for any reason** as determined by TurnKey, then TurnKey, in our discretion, may provide Guest with a comparable home at no additional cost to the Guest or cancel and refund the Guest's reservation." (emphasis added).

58.     Critically, the COVID-19 crisis has rendered rental properties across the country unavailable. The sweeping shelter-in-place and stay-at-home orders the crisis has required—which order residents to stay in their homes and forego travel—did not make only certain homes unavailable, but rather *every* property within affected geographic areas, precluding TurnKey from providing a "comparable home."

59.     Moreover, certain states and local governments have altogether banned vacation rentals like those TurnKey offers.

60.     For example, at least seven states in which TurnKey manages properties have banned vacation rental since pandemic began: Florida, Georgia, Hawaii, Maine, Massachusetts, Nevada and South Carolina.[6]

61.     Hundreds, if not thousands, of counties and cities likewise have prohibited vacation rentals during the pandemic, in states as varied as, by way of example, California, Oregon and Washington on the West Coast, to New York and North Carolina on the East Coast.

---

[5] https://www.turnkeyvr.com/rental-agreement (last visited Apr. 22, 2020) (attached hereto at **Exhibit A**).
[6] *See* https://www.nytimes.com/2020/04/10/travel/coronavirus-us-travel-driving-restrictions.html (last visited Apr. 22, 2020).

62.     TurnKey itself recognizes that COVID-19 has precluded travel and rendered properties unavailable, and cancelled reservations accordingly. For example, TurnKey cancelled Plaintiff Cahill's reservation on March 31, 2020, citing restrictions imposed by Mount Pleasant, South Carolina.

63.     The Guest Agreement thus requires TurnKey to provide full refunds to Plaintiffs and all other similarly situated renters who were prohibited from availing themselves of their reservations due to the pandemic, regardless of whether those renters paid only a 10% deposit towards the rental or the entire reservation in full.

64.     Second, the Guest Agreement obligates TurnKey to provide refunds to customers who cancelled reservations within 72 hours of the booking. Paragraph 14 of the Agreement provides that reservations made "more than 10 days in advance are fully refundable if the guest cancels the reservation within 72 hours after the time of booking."

65.     TurnKey's Guest Agreement also explicitly incorporates by reference TurnKey's "Terms,"[7] which provide, in pertinent part, that the "Terms will be interpreted in accordance with the laws of the State of Texas and the United States of America, without regard to its conflict-of-law provisions[,]" and that all parties "agree to submit to the personal jurisdiction of a state court located in Austin, Texas or a United States District Court located in Austin, Texas" with respect to any dispute concerning the agreements.

**C. TurnKey Changes Its Refund Policy in Response to COVID-19**

66.     Rather than refund Plaintiffs and Class members as required due to the pandemic, however, TurnKey revised its refund and cancellation policies in an effort to evade its contractual obligations.

---

[7] https://www.turnkeyvr.com/terms (last visited Apr. 22, 2020) (attached hereto as **Exhibit B**).

67.     On March 16, 2020, TurnKey announced it would no longer process refunds for Class members who cancelled their rentals within the cancellation windows set forth in the Guest Agreement, or whose chosen rental properties were rendered "unavailable" due to the pandemic.[8] Moving forward, TurnKey would only provide Class members credits for future use, regardless of whether they intend to stay at a TurnKey property following the pandemic.

68.     TurnKey also guaranteed the same or similar rate *only* at the properties Class members *originally* rented, and *only* if that property is available during their preferred future dates. Class members thus bear the risk that rental rates will increase in the future as property owners seek to recoup revenues lost to the pandemic.

69.     Adding insult to injury, news reports indicate TurnKey has continued to offer properties for rent in municipalities that have prohibited vacation rentals due to the virus, despite knowing full well it will refuse to refund any monies paid once it inevitably cancels those reservations.[9]

70.     TurnKey, for its part, asserts it changed its policy to protect homeowners who rent their properties out through TurnKey. Homeowners disagree. "They're taking advantage of this," one homeowner told a local television channel. "We don't know that any of us will be here next year, that any of the guests can take advantage of this credit. We cannot assure that. They cannot assure that."[10]

71.     Despite the significant backlash to TurnKey's cancelation and refund policy, TurnKey continues to refuse to provide a cash refund to Plaintiffs and the Class.

---

[8] https://blog.turnkeyvr.com/update-to-turnkeys-cancellation-policy-regarding-covid-19-concerns/ (last visited Apr. 22, 2020).
[9] *See* https://www.cbs8.com/article/news/investigations/your-stories-8/your-stories-local-vacation-rental-companys-refund-policy-under-fire/509-5a75023c-dde2-49d2-840c-50957d4cea5b (last visited Apr. 22, 2020).
[10] *Id.*

## CLASS ALLEGATIONS

72.     Plaintiffs bring this action, individually and, pursuant to Federal Rule of Civil

Procedure 23(a), 23(b)(2), and/or 23(b)(3), on behalf of a Nationwide Class defined as follows:

> All persons in the United States who canceled reservations for
> properties managed by TurnKey Vacation Rentals, or whose
> reservations TurnKey Vacation Rentals cancelled, on or after March
> 1, 2020.

Excluded from the Class are: (a) Defendant; (b) Defendant's affiliates, agents, employees, officers

and directors; and (c) the judge assigned to this matter, the judge's staff, and any member of the

judge's immediate family.

73.     **Numerosity**: Upon information and belief, the Class is so numerous that joinder of

all members is impracticable. While the exact number and identity of individual members of the

Class are unknown at this time, such information being in the sole possession of TurnKey and

obtainable by Plaintiffs only through the discovery process. Plaintiffs believe, and on that basis

allege, that the Class consists of hundreds of thousands of people. The number of Class members

can be determined based on TurnKey's records.

74.     **Commonality**: Common questions of law and fact exist as to all members of each

Class. These questions predominate over questions affecting individual Class members. These

common legal and factual questions include, but are not limited to:

      a.    Whether a property is unavailable, within the meaning of the TurnKey
Guest Agreement, when stay-at-home or shelter-in-place orders are issued
for the geographic area in which the property is located;

      b.    Whether a property is unavailable, within the meaning of the TurnKey
Guest Agreement, when state and local governments prohibit vacation
rentals in the geographic area in which the property is located;

      c.    Whether the Guest Agreement requires TurnKey to provide Class members
a refund when a property is unavailable;

      d.      Whether the Guest Agreement requires TurnKey to provide Class members a refund when TurnKey cancels a reservation;

      e.      Whether the Guest Agreement requires TurnKey to provide Class members a refund when they cancel a reservation within an applicable cancellation window;

      f.      Whether TurnKey breached its Guest Agreement; and

      g.      Whether TurnKey was unjustly enriched by its conduct.

75.    **Typicality**: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members. Plaintiffs' and Class members' claims all arise out TurnKey's uniform conduct, statements, and unlawful, unfair, and deceptive acts and practices.

76.    **Adequacy**: Plaintiffs have no interest that conflicts with the interests of the Class, and are committed to pursuing this action vigorously. Plaintiffs have retained counsel competent and experienced in complex consumer class action litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

77.    **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by TurnKey's conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them.  Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of this case. Individualized rulings and judgments could result in inconsistent relief for similarly-situated individuals. By contrast, the class action device presents far fewer management difficulties, and provides the

benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

78.     TurnKey has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

## **VIOLATIONS ALLEGED**

## **COUNT I**

## **BREACH OF CONTRACT**

79.     Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

80.     Plaintiffs and the Class entered into TurnKey's Guest Agreement, which explicitly incorporates TurnKey's terms, when they reserved TurnKey-managed properties.

81.     Plaintiffs and the Class performed their obligations under the TurnKey Guest Agreement by providing payment in exchange for the future use of a Turnkey-managed property during definite future dates.

82.     The COVID-19 pandemic rendered Plaintiffs' and the Class's properties, as well as comparable properties, unavailable due to the slew of orders issued by state and local governments in response thereto.

83.     In accordance with paragraph 12 of the TurnKey Guest Agreement, Plaintiffs and the Class are entitled to a refund of all monies paid in connection with their Turnkey property reservations.

84.     Class members who cancelled their TurnKey reservations within seventy-two hours also are entitled to refunds in accordance with paragraph 14 of the TurnKey Guest Agreement.

85.     TurnKey breached the Guest Agreement when it refused to provide Plaintiffs and the Class with refunds.

86.     As a direct and proximate result of TurnKey's breach, Plaintiffs and the Class have suffered monetary damages and are entitled to refunds of all monies paid to TurnKey to rent a TurnKey managed property.

**COUNT II**

**UNJUST ENRICHMENT**

87.     Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint

88.     Plaintiffs and the Class conferred a direct benefit on TurnKey by reserving Turnkey-managed properties.

89.     TurnKey knowingly and willingly accepted and enjoyed the benefits conferred on it by Plaintiffs and the Class.

90.     TurnKey voluntarily accepted and retained these benefits, with full knowledge and awareness that, as a result of its conduct, Plaintiffs and the Class would not, and did not, receive the benefit of their bargain.

91.     TurnKey's retention of these benefits is unjust and inequitable under the circumstances alleged herein.

92.     Plaintiffs and the Class thus are entitled to recover the amount each paid to TurnKey to rent a TurnKey managed property.

## COUNT III

### CONVERSION

93.     Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

94.     Plaintiffs and the Class made reservations for properties that were promised in exchange for the amounts paid by Plaintiffs and the Class.

95.     TurnKey intentionally interfered with Plaintiffs' and the Class' rights granted through these reservations when TurnKey failed to refund Plaintiffs and the Class for their reservations that they could no longer use.

96.     TurnKey's decision to retain the fees paid by Plaintiffs and the Class without providing them with what was promised deprived Plaintiffs and the Class the benefit of their bargains.

97.     TurnKey's intentional interference damaged Plaintiffs and the Class in that they paid for reservations that could not be used.

98.     Plaintiffs and the Class seek a return of the prices paid for their reservations.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully request that this Court:

A.  Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B.  Appoint Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

C. Award actual damages and equitable monetary relief to Plaintiffs and the Class and/or order TurnKey to return to Plaintiffs and the Class the amount each paid to TurnKey;

D. Award pre-judgment and post-judgment interest on such monetary relief;

E. Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires TurnKey to issue refunds to any member of the Class who requests a refund;

F. Award reasonable attorneys' fees and costs; and

G. Grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the putative Class, demand a trial by jury on all issues so triable.

Dated: April 24, 2020

Respectfully submitted,

HOWRY BREEN & HERMAN, L.L.P.

Randy Howry
State Bar No. 10121690
rhowry@howrybreen.com
Sean Breen
State Bar No. 00783715
sbreen@howrybreen.com
James Hatchitt
State Bar No. 24072478
jhatchitt@howrybreen.com
1900 Pearl Street
Austin, Texas 78705-5408
Tel. (512) 474-7300
Fax (512) 474-8557

Joseph G. Sauder
jgs@sstriallawyers.com
Lori G. Kier
lgk@sstriallawyers.com
Joseph B. Kenney
jbk@sstriallawyers.com
SAUDER SCHELKOPF LLC
1109 Lancaster Ave.
Berwyn, PA 19312
Tel. (888)-711-9975
Fax (610) 421-1326

Daniel O. Herrera
dherrera@caffertyclobes.com
Kaitlin Naughton
knaughton@caffertyclobes.com
CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP
150 S. Wacker Drive, Suite 3000
Chicago, Illinois 60606
Tel. (312)782-4880
Fax (312)782-7785

Bryan L. Clobes
bclobes@caffertyclobes.com
CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP
205 N. Monroe St.
Media, PA 19063
Tel. (215) 864-2800
Fax (215) 964-2808

*Attorneys for Plaintiffs and the Class*